UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED    LAFAYETTE

OCT 31 2013

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

Meche                                           Civil Action No. 11-00561

versus                                          Judge Richard T. Haik

Key Energy Services, LLC, et al      Magistrate Judge C. Michael Hill

### REASONS FOR RULING

On June 20, 2008, Plaintiff, Willie A. Meche ("Meche"),  alleges that he injured his

back  on the deck of the M/V MISS CATHERINE when he lifted a hatch cover.  Plaintiff

filed suit in the Western District of Louisiana on April 8, 2011, asserting claims under the

Jones Act and General Maritime Law against his employer, Defendant, Key Energy Services,

LLC ("Key Energy") and his co-employee, Alex Doucet (collectively referred to as

"Defendant").  Plaintiff alleges his injury was caused by the negligence of Key Energy and

the unseaworthiness of the vessel, the M/V MISS CATHERINE. Plaintiff claims that he is

entitled to past, present and future damages for medical expenses, loss of earnings and

earning capacity, physical pain and suffering, mental anguish, and loss of enjoyment of life,

punitive damages and attorney's fees. Plaintiff further claims that Defendant has failed to

satisfy its Maintenance and Cure obligation and he is entitled to punitive damages and

attorney's fees in that regard.

Defendant denies liability and claims the injury was caused solely by the negligence

of the Plaintiff and that the vessel was seaworthy. Additionally, Defendant claims that

Plaintiff is capable of returning to work and that he has failed to mitigate his damages.

Finally, Defendant claims that Plaintiff is not entitled to maintenance and cure, but even if he was, he forfeited that right by lying on his job application.

This matter was tried before the Court as a bench trial on September 16 and 17, 2013. At the close of trial the Court advised counsel that they could brief any issues they deemed pertinent and could also point out to the Court those exhibits and testimony which the parties thought to be pertinent.  Both parties submitted supplemental briefs.

The Court, having heard and considered all of the evidence in this case, as well as the arguments of the parties, having observed the demeanor of the witnesses, and having carefully read and considered the proposed findings of fact and conclusions of law submitted by the parties, now by a preponderance of the evidence makes the following Findings of Fact and arrives at the following Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)[1]:

### *Findings of Fact*

1. Meche was the employee of Key Energy on or about the evening of June 20, 2008.  It is undisputed that Meche was a Jones Act Seaman, because he was the captain of a vessel in navigable waters, the M/S MISS CATHERINE.  The vessel was an approximate 40-foot crewboat that serviced a Key Energy posted barge drilling vessel.  Meche contends that he was injured in the service of the vessel while checking the engine oil on the evening of June 20, 2008.

---

[1]To the extent any of the following findings of fact comprise conclusions of law or a mixed finding of fact and law, they shall be considered as such.

2. Meche had worked on boats for about 46 years.  The Court finds that Meche was an experienced boat captain.  *Record, Plaintiff's Testimony.*

3. Meche was originally hired on November 29, 2006 by Moncla Marine, who later sold the business to Key Energy.

***June 20, 2008 Incident***

4. Meche has provided numerous versions of the unwitnessed incident:

(a) The Incident Report completed the morning of June 21, states,  "Employee [Meche] alone on crew boat, opened hatch to enter cabin felt pain in his lower back" causing "sprain/strain" to his "trunk and back" due to "improper lifting, pushing or pulling."  The weather was noted as "clear.  *Record, P-18; D-12.*

(b) Meche's June 21, 2008 statement provides that the incident occurred at about 11 p.m. after he had moved the crew boats to the port side of the rig where the waves weren't as rough.  When he picked up the second hatch on the starboard side to check the oil on the crew boat he felt a sharp pain in his back "like he was getting electrocuted" - "a shock like." Meche stated, "[he] just dropped the cover down and  went on the rig and that was it [he] didn't do nothing else after that."  Because there was no one available, he walked upstairs to the galley and waited until someone awoke in the early morning hours "to tell a couple of people about it, whoever I seen."

(c)  Meche confirmed his deposition testimony that the water was very choppy the evening of the incident.  While he was opening the hatch cover with his "back towards the

3.

rig," the rig turned into a five (5) foot wave which "twisted [him] around," causing him to "cut a flip" and fall "between the rig and the boat and the railings." He went over the side of the boat and landed "between the crew boat and the rig" but the tires tied to the rig "stopped it from mashing me flat." He though he had been electrocuted and he crawled across the rig and climbed two flights up a ladder to the galley where he waited six or seven hours until somebody came. *Record, Plaintiff's Testimony regarding his Deposition, pp. 142-146.*

(d) Meche told his son, Bertrand Meche, that the hatch fell on him. *Record, Bertrand Meche's Testimony.*

(e) During his March 6, 2013 examination by Dr. Stanley Foster Meche stated, "there was a fairly severe storm going on" and when he picked up the hatch to do maintenance, "a wave came over the back end of the boat and actually threw him through the railing of the boat where he hit the rails and then onto the rig.... Some of the workers on the rig eventually got him up and helped him up the stairs to the top." *Record, Foster's Testimony.*

(f) Meche testified at trial that he was standing on the starboard hatch cover and raising the port side hatch cover when the rig turned, "straddling the wake." This caused him to "cut a flip backwards" and he was thrown from the port hatch "completely over the railing," which was above his waist. He "couldn't swear if [he] went through [the rails] or over them." He landed on the rig deck with his "arm on the tire on the side of the rig" and he crawled back to the top of the rig which took him a hour and a half. He didn't hurt his

4.

neck - only his back hurt. The waves "twisted" him – "like [he] got electrocuted." *Record, Plaintiff's Testimony.*

5.  Based on the buoy reports and forecasts for June 20, 2008, winds were light and variable 5-10 knots and seas 1-2 feet. *Record, Testimony of Perillo, Exh. D-15, Report of Studwell.*

6.  The starboard side of the M/V MISS CATHERINE was tied up to the port side of the drilling rig.

7.  The photographs of the hatch covers on the M/S MISS CATHERINE show that each hatch cover opens from the middle and locks in place when fully raised. *Record, Plaintiff's Testimony, D- 8-1, 8-2, 8-3, 8-5; P-59.*

8.  Neither the hatch covers nor their locking mechanisms were defective. Lifting the hatch covers was a one man operation which he performed daily as part of his job duties as the vessel captain. *Record, Plaintiff's Testimony.*

9.  Meche routinely fueled the vessels and put some oil in the engine during his night shift so the other boat captain could go to the landing at 6:00 in the morning. *Record, Plaintiff's Testimony.*

10. Captain Andre L. Le Goubinn, MA, FNI, Defendant's Independent Marine Consultant, inspected and measured the hatch covers and the railing on the M/V MISS CATHERINE in 2013. The hatch covers measured 6 feet long by 4 feet wide, the starboard hatch was 3 feet 6 inches from the outboard edge of the hatch and 4 feet 6 inches inboard of the safety rail, and there was a 22 ½ inch wide walkway from the rail to the edge of the vessel. If Meche

was lifting the starboard hatch cover he would have to travel horizontally "approximately 6 feet 4 ½ inches from the outboard side of the vessel" to end up on the outside of the rail. If Meche was lifting the <u>port</u> hatch cover it would have been longer than that. "[Meche] would have had to clear 3 feet to get over the rail." Regardless of the seas, it was "highly unlikely" that Meche could have fallen backwards, flipped over the rail and landed on the drilling rig. *Record, Testimony of Le Goubinn.*

11. The record contains no evidence that anyone told Meche to check the oil after he had moved the crew boats without incident. Rather the evidence is uncontradicted that Meche chose to check the oil himself. *Record, Plaintiff's Testimony.*

12. The Court finds Meche's conflicting accounts of the unwitnessed accident and the inconsistencies in his various statements and testimony raise serious doubts about whether or not an accident occurred and about his claims of negligence on the part of Key Energy.

13. The Court finds the only consistency in Meche's statements and testimony related to the incident is that at about 11:00 p.m. on the evening of June 20, 2008, he felt a pain in his lower back while raising a hatch cover on the M/S MISS CATHERINE to perform routine maintenance.

14. Meche was seen by Dr. Gregory Gidman on June 21, 2008, for severe lower back pain. Dr. Gidman performed lumbar spine x-rays and an examination and recommended that Meche could resume regular activities at work as directed but that should he be restricted from any "heaving or very heavy lifting and repetitive bending or twisting." Page one of Dr.

6.

Gidman's report stated that Meche could return to work as directed.  Page two provided the restrictions.   *Record, 11-G, KDC-Meche 003860; P-53, WM002813*.  Meche never went back to work or asked to return because he "was in too much pain."  *Record, Plaintiff's Testimony*.

### Employment by Moncla and Key Energy

15.  Andrew Willy Meche ("Meche Jr."), Meche's son, and his wife, Lesly Meche, were with Meche when he applied for a boat captain position with Mike Martens at Moncla.  Meche told Martens  he was drawing disability because he had problems with his back and neck as well as his eye.  Martens stated he would hire Meche if he passed his physical. Lesly Meche filled out the Moncla employment questionnaire because Meche doesn't read and write very well.  *Record, Testimony of Andrew Willy Meche*.

16.  Lesly Meche filled out the questionnaire for Meche and also filled out some of the paperwork at his physical examination.   She began asking Meche the answers to the questions but before she finished, he was called to go for medical testing.  She finished answering the questions herself and when Meche returned, he signed the questionnaire without reading it.  She did not know whether or not Meche had neck or back problems. *Record, Testimony of Lesly Meche; P-2, WM000160*.

17.  Meche talked with Mike Martens and "told him everything" – "that I had got hurt already. I told him I had some lawsuits.  I told him that I was drawing disability." Martens told him that if he could pass a physical he could have the job.  He never read the Moncla

questionnaire after Lesly Meche filled it out.  Because Meche was taking a computer test too slowly, Martens completed the test for him because he was in a hurry to leave his office. When Key Energy took over Moncla they did not perform a physical exam nor did they ask him any questions about his medical problems.  *Record, Testimony of Meche;  P-11.*

18.  Meche's employment physical with Moncla was performed by Dr. Phillips-Savoy on November 29, 2006.  Dr. Phillips-Savoy's report identified "arthritis with spurring, joint space narrowing, moderate to severe arthritis" and indicated that Meche was released to work at "Regular Duty as Directed" with restrictions to "avoid heavy/very heavy lifting, rep[etitive] bending/twisting or prolong[ed] or longlasting unchanged positions or [highly] vibrating motion."   Key Energy "did not do good due diligence" on Meche when they accepted him as a boat skipper in 2008 with out an updated physical examination but rather took Moncla's employee [Meche] "as he was."  *Testimony of Kenneth Houston; P-2, WM000161.*

19.  The Court finds that Key Energy did not require Meche to undergo a pre-employment medical examination or interview. The Court further finds that because Key Energy never questioned Meche about any medical problems, but rather allowed him to continue working as a boat captain just as he had done for Moncla since 2006, Meche did not believe Key Energy considered his existing medical problems a matter of importance.

20.   Houston did not read page two of Dr. Gidman's report and erroneously believed that Meche was released without restrictions.  If Meche had returned to work after the accident

with the restrictions being considered, Key Energy had light duty positions available to offer him. Key Energy would have found or made up a position for Meche because, "We do that routinely. Always have." Examples of light duty jobs are, "[w]orking in the parts room," "[m]oving things in the mail room," general "support functions" and "night watchman." *Record, Testimony of Houston.*

21.  Because Meche never came back to work at Key Energy and never asked for another position, Key Energy terminated him for failure to report/job abandonment. Because Key Energy did not understand that Meche could return to full duty with restrictions, they did not send Meche a certified letter to that effect. *Id.*

*Maintenance and Cure*

22.  Key Energy contracted with Liberty Mutual to provide their Workers' Compensation insurance, and as their agent, Liberty Mutual made all maintenance and cure decisions. *Id.*

23.  Based on Liberty Mutual's logs, Meche was not paid maintenance because his medical records had been requested but never received, so Liberty Mutual could not make a determination as to whether or not there was ongoing medical treatment. Liberty Mutual knew Meche had been released for work by Dr. Gidman. *Id.*

24.  A letter from Meche's attorney was received by Liberty Mutual on August 11, 2008. Meche called Liberty Mutual on September 8, 2008 indicating that was seeing a surgeon and "[his] attorney was taking care of" sending "disability slips and meds." Multiple entries in Liberty Mutual's logs from November 7, 2008 through December 18, 2009, contain adjuster

statements such as, "no information as to what is happening medically ... so no maintenance and cure is being paid;" "[f]ile on hold until we get something showing [Meche] is owed;" and "[c]urrently we have no medical to support any lost time, even though we have continued to ask for it." *Record, P-53, WM002813 - 2826.*

25.   The first time Meche made a demand for maintenance and cure was on May 22, 2012. On May 25, 2012, Meche submitted discovery responses to Key Energy's defense attorney which included Dr. Ray Williams' June 10, 2010  recommendation for "anterior cervical diskectomy and fusion from C3-C7" surgery on Meche. *Record, P-47.*  In June 2012, Key Energy asserted the *Mc Corpen* defense. *Record, D-18.*

26.   Meche's monthly food and lodging expenses are: (1) rent - $350.00; (2) utilities (electricity and water) - $240; and (3) food - $200. These expenses total $790 per month, and average  $25.97 per day.[2] *Record, Plaintiff's Testimony; Exh. P-61.*

27.  Meche also notes the following expenses: (1) Loan/Tessie Lanclos - $5,000; (2) Back Rent - $1,150; Loan - $1,000; and Truck payments - $4,500. *Id.*

28.  Meche's total medical expenses post-incident for his cervical and lumbar treatment, MRIs and discograms are $83,138.63. *Record, P-1, Stipulated Medical Bills.*

29.  The cost of Meche's proposed cervical surgery is $170,558.80 and the cost of his proposed lumbar surgery is $189,540. *Id.*

30.  Key Energy has not paid any maintenance and cure to Meche.

---

[2] Plaintiff incorrectly calculated the daily average as $25.77/ day.  *P-41.*

31. Prior to the incident at issue, Meche was injured in the following work-related accidents: (1) October 10, 1984 fall while employed by Associated Drilling after which he was diagnosed with 3 herniated cervical discs; (2) November 28, 1990 fall in which he "cut a back flip" "in the Key way" and injured his neck while employed by Falcon Drilling; (3) October 25, 1994 unwitnessed fall in which he also "cut a flip" while employed by T.L. James & Company and was diagnosed with post-traumatic back pain and degeneration of lumbar discs 3-4, 4-5 and 5-1. *Record, Plaintiff's testimony.*

**Medical Records**

32. Meche was treated by Dr. Stuart Phillips and Dr. Kenneth Adatto from 1985 through 1986. Meche's March 6, 1986 cervical discogram indicated "three bad discs. The 4-5 being the worst and is symptomatic... Because he has three discs, I'm not as excited about operating on him as I had been before, and I'm going to go even slower." Dr. Phillips diagnosed Meche with "cervical herniated nucleus pulposus" and prescribed Vicodin for pain. *Record, Exh. D-11-C, KDC-MECHE 002007 - 2008.*

33. On July 8, 1991, Dr. John W. Watermeier found that Meche "has continued symptoms of neck and arm pain consistent with cervical disc syndrome. His present symptoms are consistent with his prior symptoms of pain in the neck and arm which seems to be an aggravation of his pre-existing condition." *Record, Exh. D-11-C, KDC-MECHE 002000-2001.* Dr. Watermeier agreed with Dr. Phillips' reluctance to operate on either the cervical or lumbar spine because of the difficulty in treating multiple levels with surgery. *Record, Dr.*

11.

*Watermeier, pp. 31-32.*

34. Dr. Joseph Rauchwerk treated Meche from 1995 through January 1996 for low back pain, which Meche described as "electrical shocks into right leg and foot." Dr. Rauchwerk found "preexisting degenerative intervertebral lumbar disc disease" of 3-4, 4-5, and 5-1 which was "activated and aggravated by the fall" at T.L.James in 1994. *Record, KDC-MECHE 2383-2384.*

35. Meche continued to complain of lumbar spine pain from 1995 through 2004. *Record, KDC-MECHE 003907-3908, 003951-3952.*

36. Dr. Deidre Stelly treated Meche from July, 2004 June, 2010 for management of his pain and diagnosis of "his neck issues." *Record, D-11-A, KDC-MECHE 003688- 3716.* During Dr. Stelly's treatment, his requirements for pain medication increased from 1 Vicodin per day to 3 Vicodin per day in March of 2007, when Meche complained that "the rocking, the bouncing of the boat" caused a worsening of his pain. On November 14, 2008, Meche told Dr. Stelly he had to stop working because the rough waters were giving him pain. Dr. Stelly's record do not indicate that Meche ever complained to her of back pain. *Record, Depo. Of Stelly, pp. 48-50; p. 23; p. 29.*

37. Dr. Stelly prescribed 90 tablets of 10 mg Vicodin/per month to Meche. *Record, Testimony of Foster.*

38. Dr. George "Ray" Williams, board certified orthopedic surgeon, saw Meche from March 23, 2009 through April 12, 2011. *Record, P-40&41.* On June 7, 2011, Dr. Williams

recommended that he perform "anterior cervical diskectomy and fusion" on 4 levels of Meche's cervical spine, and "posterior decompression and fusion" on 2 levels of Meche's lumbar spine. *Id., pp. WM001866-67*. The benefits of the surgeries "would have hopefully decreased the pain" Meche was having. *Id. WM001811*. The June 20, 2008 incident "seemed to produce the pain and dysfunction that [Meche] was having that we were requiring the surgery for." Dr. Williams' opinion was based on Meche's own history that he was doing well prior to the June 20, 2008 incident and his June 21, 2008 medical records from Dr. Gidman. *Id.* He did not know that Meche was taking pain medication from 2004 to the time of the incident. He knew that Meche had "some type of history of lumbar disc problems" and "a discogram evaluation many years ago." If he been advised that Meche had ruptured discs which were requiring continued constant medical care and attention that would have affected his opinion. *Id., WM001813-1814*.

39. Dr. Stan Foster, board certified orthopedic surgeon, performed an IME on Meche on March 6, 2013, almost two years after Dr. Ray Williams suggested that Meche have surgery. Dr. Foster took Meche's history, reviewed film studies of the lumbar and cervical spine, and performed a physical examination. Meche complained of constant aching pain in his neck that occasionally radiated down to his right hand and intermittent pain in his lower back.

Meche's August 6, 2008 and April 25, 2011 cervical MRI revealed spondylosis and/or stenosis at all levels and disc narrowing and bulges at C3-4, C4-5, C5-6 and C6-7. At that time Meche was diagnosed with multi-level cervical degenerative disc disease, which tends

to get worse with age and is more common in workers performing manual labor. Meche's August 6, 2008, September 9, 2009 and April 25, 2011 lumbar MRIs revealed disc desiccation and stenosis at all levels, with bulging at L3-4 and L4-5, and degenerative spondylolysis at L5-S1 and scoliosis. Meche was diagnosed with long-standing degenerative lumbar disc disease. Meche's examination was "normal," with no radiculopathy in his hands or legs and no objective symptoms. *Record, Testomony of Foster.*

Disc desiccation, drying of the disc, and spondylosis – calcium deposits,  occur over a long period of time. Meche's pre-existing multi-level cervical and lumbar degenerative disc disease resulted in tears of the annulus, disc herniation, and caused his pain. Any aggravation of Meche's pre-existing injuries had healed and Meche had reached MMI by March 6, 2013 at the latest. Meche did not need any cervical or lumbar surgery – he should be treated conservatively because multi-level disc surgery is risky. *Record, Testimony of Foster.*

40. On March 5, 2012, Meche stated that his "doctors want to perform surgery on his neck and back, but he doesn't want." *Record, KDC-MECHE 004018.*

41.  Meche did not testify that he wants the surgeries. *Record, Plaintiff's Testimony.*

### Conclusions of Law

Pursuant to Federal Rule of Civil Procedure 52(a) the Court makes the following conclusions of law:

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C § 1333 which provides

14.

original jurisdiction over admiralty or maritime claims, the Jones Act, 46 U.S.C. § 30104, General Maritime Law, and Rule 9(h) of the Federal Rules of Civil Procedure. Venue is proper because the defendants are subject to the personal jurisdiction of this Court.

2. The matters before the Court include whether Meche is entitled to any maintenance and cure benefits, determination of the cause of Meche's injuries, whether Key Energy was negligent under the Jones Act and whether the M/V MISS CATHERINE was unseaworthy under the General Maritime Law.

### Negligence Under the Jones Act

3. [A] claim under the Jones Act requires a finding both of negligent breach of duty and proximate cause to the injury. *Myles v. Quinn Menhaden Fisheries, Inc.*, 302 F.2d 146 (5th Cir. 1962).

4. "A seaman is entitled to recovery under the Jones Act if his employer's negligence is the cause, in whole or in part, of his injury." *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir.1997) (en banc).

5. Both an employer and a seaman are subject to an ordinary standard of care defined by the reasonable person under similar circumstances. *Id.* at 338-39.

6. Based on the testimony adduced at trial, Court finds that Key Energy was not negligent. Meche confirmed that he was not injured while moving the crew boats as he was ordered to do. Rather, his injury occurred while he was opening the hatch cover to check the vessel's oil. Meche conceded that he was not ordered to check the oil and that it was his decision to

do so.

### *Unseaworthiness*

7.  To be seaworthy, a vessel and its appurtenances must be reasonably fit for their intended uses. *Manderson v. Chet Morrison Contractors, Inc.*, 666 F.3d 373, 379 (5th Cir. 2012).

8.  Plaintiff bears the burden of establishing unseaworthiness and that it caused his injuries. *Id.*

9. "There is a more demanding standard of causation in an unseaworthiness claim than in a Jones Act negligence claim.   To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness. Some condition or defect may be a legally sufficient cause of an injury under a Jones Act theory of liability but not under an unseaworthiness theory." *Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988)(internal citations omitted).

10. The Court finds that the record is void of any evidence that the vessel was unseaworthy.

### *Maintenance and Cure*

11. A claim for maintenance and cure is based on the contract of employment between a seaman and his or her employer. If a seaman becomes ill or injured in the course of employment the seaman is entitled to receive the reasonable cost of food and lodging and medical treatment until maximum cure is achieved. *See* Robert Force & Martin J. Norris, *The*

*Law of Seamen*, § 26:2 (5th ed.2012); see also *Atlantic Sounding v. Townsend*, 557 U.S. 404, 413 (2009).

12. An employer's duty to provide maintenance and cure to a seaman injured in the service of a vessel is "practically absolute." *Johnson v. Cenac Towing, Inc.*, 599 F.Supp.2d 721, 726 (E.D.La.2009) (Vance, J.). Indeed, this duty is so broad that it "has at times been compared to mandatory employer-provided health and accident insurance." *Johnson*, 599 F.Supp.2d at 726 (citations omitted). Consequently, a seaman's burden of proof for a maintenance and cure claim is "slight," and he need only establish that he was injured "while 'subject to the call of duty as a seaman.'" *Johnson*, 599 F.Supp.2d at 725 (citing *Aguilar v. Standard Oil Co. of N.J.*, 318 U.S. 724, 732 (1943); 1 Schoenbaum, *Admiralty and Maritime Law*, § 6–28; Fifth Circuit Pattern Jury Instructions: Civil § 4.11 (2009 ed.)).

13. "Maintenance and cure are available even where a seaman has a longstanding illness which does not manifest itself until some point during his employment on a vessel, even if that employment is not responsible for causing the illness to appear or worsen" *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 183 (5th Cir.2005).

14. The Court finds that Meche's pre-existing cervical spine condition was not injured, worsened or aggravated on June 20, 2008.

15. The Court finds that Meche aggravated his pre-existing lumbar illness when he lifted the hatch cover on the M/V MISS CATHERINE on June 20, 2008.

*McCorpen Defense*

17.

16. An employer is entitled to investigate a seaman's claim for maintenance and cure, and rely on certain defenses to deny benefits when appropriate. One such defense is the *McCorpen* defense, which precludes a seaman's recovery of maintenance and cure when he intentionally conceals a pre-existing medical condition from his employer. *Brown*, 410 F.3d at 171 (citing *McCorpen v. Cent. Gulf S.S. Corp.*, 396 F.2d 547, 548–50 (5th Cir.1968)).

17. To prevail on a *McCorpen* defense, an employer must prove three elements:  (1) the seaman intentionally misrepresented or concealed medical facts; (2) the non-disclosed facts were material to the employer's decision to hire the seaman; and (3) a connection exists between the withheld information and the injury complained of in the lawsuit. *Brown*, 410 F.3d at 171 (citing *McCorpen*, 396 F.2d at 548–49). *McCorpen's* intentional concealment prong is an objective inquiry that "neither necessarily turns on credibility nor requires subjective determination." *Brown*, 410 F.3d at 175.

18. "In cases involving pre-existing conditions, courts distinguish between nondisclosure and concealment." *Jauch v. Nautical Services, Inc.*, 470 F.3d 207, 212 (5th Cir.2006) (per curiam). The standard a court must apply to determine if a seaman intentionally concealed a pre-existing condition turns on whether the employer required the seaman to undergo a pre-employment medical examination or interview. If the employer does not require a pre-employment medical examination or interview, a seaman must disclose his pre-existing condition "'when in [the seaman's] own opinion' " his employer " 'would consider it a matter of importance.'" *Jauch*, 470 F.3d at 212 (quoting *McCorpen*, 396 F.2d at 548–49). By

contrast, if the employer does require such a medical examination or interview "as part of its hiring process, a seaman who misrepresents or conceals any material medical facts, disclosure of which is plainly desired, risks forfeiture of his maintenance and cure benefits." *Jauch*, 470 F.3d at 212 (citing *McCorpen*, 396 F.2d at 549). "Failure to disclose medical information in an interview or questionnaire that is obviously designed to elicit such information ... satisfies the 'intentional concealment' requirement." *Brown*, 410 F.3d at 174.

19. When an employer receives a claim for maintenance and cure, it is entitled to investigate and require corroboration of the claim before making payments. *MNM Boats, Inc., v. Johnson*, 248 F.3d 1139 (5th Cir.2001). If an employer, after conducting the investigation, unreasonably refuses to pay maintenance and cure, it is liable for maintenance and cure and also compensatory damages. *Id*. If the employer has shown callousness and indifference to the seaman's injuries, it is liable for punitive damages and attorney's fees. *Id., see also Townsend*, 557 U.S. 404, 424.

20. To prove an employer's conduct was arbitrary and capricious, a seaman must do more than prove the employer's conduct was unreasonable. *Manderson v. Chet Morrison Contractors, Inc.*, 666 F.3d 373, 380, 383 (5th Cir.2012). The willful and wanton conduct necessary to justify an award of punitive damages requires an element of bad faith. *Great Lakes Dredge, quoting Harper v. Zapata Offshore Co.*, 741 F.2d 87, 90 (5th Cir. 1985).

21. The Court finds that because Key Energy did not require a pre-employment medical examination or interview and because Meche did not consider his pre-existing condition to

be a matter of importance, Meche did not intentionally conceal his medical history and the *McCorpen* defense does not apply in this case.

22. The Court finds that Meche was entitled to maintenance and cure based on the aggravation of his pre-existing lumbar condition on June 20, 2008.

23. Based on Key Energy's failure to read the entirety of Dr. Gidman's report and offer Meche the light duty positions routinely offered to injured employees, the Court finds  Key Energy's failure to pay Meche maintenance and cure constituted unreasonable and wanton misconduct necessary to justify an award of punitive damages for bad faith.

**Maintenance and Cure Award**

24.  Maintenance is the seaman's right to food and lodging, and Cure is the seaman's right to necessary and appropriate medical services. Both rights extend to the point at which the seaman reaches maximum medical improvement ("MMI").  *Rashidi v. Am. President Lines,* 96 F.3d 124, 128 (5th Cir.1996).

25. To recover maintenance, the seaman plaintiff must produce "evidence to the court that is sufficient to provide an evidentiary basis for the court to estimate his actual costs." *Hall v. Noble Drilling (U.S.) Inc.,* 242 F.3d 582, 590 (5th Cir.2001).  If the seaman has incurred living expenses, he is entitled to the reasonable cost of food and lodging. *Id.* at 587.  "A seaman's burden of production in establishing the value of maintenance is feather light: his own testimony as to reasonable cost of room and board in the community where he is living is sufficient to support an award." *Yelverton v. Mobile Labs.,* 782 F.2d 555, 558 (5th

Cir.1986) *citing Curry v. Fluor Drilling Services, Inc.*, 715 F.2d 893 (5th Cir.1983). Lodging includes expenses "necessary to the provision of habitable housing," such as heat, electricity, home insurance, and real estate taxes. *Hall*, 242 F.3d at 587 n. 17 *citing Gillikin v. United States*, 764 F.Supp. 270, 273 (E.D.N.Y.1991)).

26. The court's determination of the appropriate amount of the maintenance involves three steps: First, the court must estimate two amounts: the plaintiff seaman's actual cost of food and lodging; and the reasonable cost of food and lodging for a single seaman in the locality of the plaintiff. In determining the reasonable cost of food and lodging, the court may consider evidence in the form of the seaman's actual costs, evidence of reasonable costs in the locality or region, union contracts stipulating a rate of maintenance or per diem payments for shoreside food or lodging while in the service of the vessel, and maintenance rates awarded in other cases for seamen in the same region. A seaman need not present evidence of the reasonable rate; a court may take judicial notice of the prevailing rate in the district. Second, the court must compare the seaman's actual expenses to reasonable expenses. If the actual expenses exceed reasonable expenses, the court should award reasonable expenses. Otherwise the court should award actual expenses. Thus the general rule is that seamen are entitled to maintenance in the amount of their actual expenses on food and lodging up to the reasonable amount for their locality. Third, there is one exception to this rule that the court must consider. If the court concludes that the plaintiff's actual expenses were inadequate to provide him with reasonable food and lodging, the plaintiff is entitled to the amount that the

court has determined is the reasonable cost of food and lodging. *Hall*, 242 F.3d at 591 (internal citations omitted).

27. Conflicting diagnoses and prognoses of various physicians present a question to be determined by the trier of fact in connection with the entitlement to maintenance and cure benefits and whether an employer's termination of maintenance and cure benefits was arbitrary or capricious. *Tullos v. Resource Drilling, Inc.*, 750 F.2d 380 (5th Cir.1985).

28. Courts sitting in the Western District of Louisiana have approved maintenance rates ranging from $20.00 to $40.00 per day. *See e.g. Leger v. Offshore Staffing Services of Acadiana*, 2012 WL 525477, *1 (W.D.La.)($25.00 per day); *Manderson v. Chet Morrison Contractors, Inc.*, 2010 WL 3035491, *8 (W.D.La.)($40.00 per day); *Reed v. Ensco Offshore Co.*, 2008 WL 1733663, *2 (W.D.La.)($20.00 per day); *Theodile v. Delmar Systems, Inc.*, 2007 WL 2491808 (W.D.La., 2007) ($20.00 per day)." *Washington v. Omega Protein Inc.*, 2012 WL 4471104, 5 (W.D.La.,2012).

29. Based on Meche's testimony and the evidence presented at trial, the Court finds Meche is entitled to $25.97 per day in maintenance payments, to be applied retroactively to the date of the incident, June 20, 2008.

30. Seamen injured in the course of their employment are entitled maintenance and cure benefits until they reach the point of maximum medical improvement ("MMI"). *See Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir.1987).

31. MMI is the point at which no further improvement in the seaman's medical condition is

reasonably expected. *See Lauland v. Hugh Eymard Towing Co., Inc.,* 2000 WL 533880, *7 (citing *Farrell v. United States,* 336 U.S. 511, 518 (1949)). In other words, MMI is the point beyond which it is not reasonably possible that medical treatment will "reduce [the amount of the seaman's] disability," be "curative," "better the seaman's condition," or "improve [his] health." *Vella v. Ford Motor Co.,* 421 U.S. 1 (1974); *Gaspard v. Taylor Diving & Salvage Co.,* 649 F.2d 372, 374 n. 3 (5th Cir.1981). If "future treatment will merely relieve pain and suffering," then MMI has been reached. *Pelotto v. L & N Towing Co.,* 604 F.2d 396, 400 (5th Cir.1970).

32. The maintenance and cure duty does not extend to treatment which is only palliative in nature and "result[s] in no betterment in the claimant's condition." *Rashidi v. Am. President Lines,* 96 F.3d 124, 128 (5th Cir.1996).

33. Because Meche's pre-existing cervical condition was not aggravated by the incident, Meche is not entitled to medical related to his cervical spine nor the costs of the cervical surgery as recommended by Dr. Williams.

34. Because Meche's pre-existing lumbar degenerative disease was aggravated by the June 20, 2008 incident, Key Energy owes Meche cure for medical expenses related to his lumbar injury.

35. Meche's medical expenses related to both his cervical and lumbar treatment, MRIs and discograms was $83,138.63. Key Energy owes Meche $41,569.32 in medical expenses related to his lumbar spine treatment. *Record, P-1.*

36. The lumbar surgery recommended by Dr. Williams to reduce Meche's pain relief is

merely pallative and cure does not extend to payment for the surgery.  But even if it was not pallative, Meche stated he did not want the surgery.  Thus, the evidence is insufficient to support any award for such future medical expenses related to plaintiff's lumbar surgery. *See, Townsend v. Diamond Offshore*, 2009 WL 2447996, 5 (E.D.La.,2009).

37. The Court finds Meche reached MMI by March 6, 2013, alleviating Key Energy of any further maintenance and cure obligations thereafter.

38. The Court finds Key Energy owes Meche punitive damages and attorney's fees in the amount of $43,118.86 for unreasonably refusing to pay maintenance and cure.

39.  Pursuant to the Court's admiralty jurisdiction invoked under the Federal Rules of Civil Procedure 9(h), when a Jones Act case is brought under the courts admiralty jurisdiction, and the case is tried to the Court and not to a jury, as in this case, an allowance of prejudgment interest is within the discretion of the trial Court, even if there is not a finding of unseaworthiness.  *See Williams v. Reading and Bates Drilling Co.*, 750 F.2d 487 (5th Cir.1985).

40. It is within the discretion of the Court to select an equitable rate of pre-judgment interest. *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir.1991).

41. The Court awards prejudgment interest from the date of injury, June 20, 2008, until paid.

## Conclusion

Based on the Court's findings of fact and conclusions of law, the Court finds that Willie A. Meche has failed to meet his burden of proving that Key Energy was negligent or that Key Energy's vessel, The M/V MISS CATHERINE was unseaworthy.  The Court

further finds that Key Energy owes Willie A. Meche   Maintenance and Cure for the aggravation of his pre-existing lumbar condition and punitive damages and attorney's fees for failure to pay the requisite maintenance and cure due Meche.  Accordingly, judgment will be entered in favor of Willie A. Meche for $129,356.58 ($44,668.40 Maintenance + $41,569.32 Cure + $43,118.867 punitive damages/attorney's fees) with pre-judgment and post-judgment interest and the costs of this proceeding.

Richard T. Haik
United States District Judge

25.